IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UMB BANK N.A. in its capacity as (i) bond trustee under the Trust Indenture dated as of May 1, 2012 between the Oklahoma Development Finance Authority and the UMB Bank, N.A., (ii) Bond Trustee under the Trust Indenture dated as of July 1, 2013 between the Oklahoma Development Finance Authority and UMB Bank, N.A., and (iii) Master Trustee under the Master Trust Indenture dated as of November 1, 2007 among Asbury Communities, Inc., as obligated group agent, Inverness Village and UMB Bank, N.A. as master trustee,<br><br>        Plaintiff,<br><br>v.<br><br>ASBURY COMMUNITIES, INC.,<br>a Maryland nonstock corporation,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 20-CV-160-TCK-CDL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**OPINION AND ORDER**

Before the Court is the Defendant's Partial Motion to Dismiss Plaintiff's Second Amended Complaint filed pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 55). Plaintiff filed a Response (Doc. 56), and Defendant filed a Reply. (Doc. 57).

The plaintiff, UMB Bank N.A. ("UMB") alleges the defendant, Asbury Communities, Inc. ("Asbury") breached three separate contracts, all governed under different states' laws. It also alleges Asbury tortiously interfered with UMB's prospective economic advantage with respect to Inverness Village ("Inverness"), a non-party, and impermissibly interfered with its contract with Inverness. While Asbury acknowledges UMB's allegations are enough to avoid dismissal at this stage on the contract claims, it contends the tort claims should be dismissed as a matter of law.

## I. BACKGROUND

Inverness was a nonprofit located in Tulsa, Oklahoma, that owned and operated a continuing care retirement community. Bonds were issued to raise funds for Inverness. UMB was the trustee under the bonds and the entity entitled to receive Inverness' payments. Inverness was responsible for repaying the principal and interest payments on the bonds. Asbury is a nonprofit, nonstock corporation which is the sole member of Inverness. Further, Asbury often times funded Inverness over the years to help Inverness serve its residents.

This litigation emanates from Inverness' breach of its agreement to repay a debt owed to UMB. Inverness subsequently filed for bankruptcy. UMB has asserted tortious interference with prospective business advantage and tortious interference with contract claims against Asbury under Oklahoma law. Specifically, UMB alleges Asbury's tortious actions interfered with UMB's prospective bond restructuring deal with Inverness, and Asbury's tortious actions also interfered with Inverness' future ability to make bond payments under the Bond Documents.

Asbury, however, contends that UMB was left with limited options due to Inverness' bankruptcy, and now impermissibly attempts to recover against Asbury by way of its claims for tortious interference. Asbury asserts in its Motion to Dismiss that " At the time Inverness filed bankruptcy, Inverness owed Asbury many million dollars that Asbury will never recover … Now, even though Asbury had no obligation to continue to fund Inverness when it would never be repaid, UMB wants Asbury to pay even more money to cover UMB's alleged financial losses caused by Inverness' bankruptcy." (Doc. 55 at 2).

Inverness defaulted on its payment obligations to UMB in January of 2018 resulting in financial harm to UMB. According to UMB's Second Amended Complaint ("SAC"), UMB and Inverness explored opportunities to restructure the debt and cure Inverness' default throughout

2018 but these efforts ultimately failed. Now, UMB alleges the restructuring was unsuccessful due to Asbury's conduct. Specifically, UMB claims that Asbury tortiously interfered with its prospective economic advantage by replacing Inverness' Board of Directors. In its SAC, it also claims that Asbury interfered by failing to continue to support Inverness financially, continuing to take management fees, understating Inverness' liquidity, and failing to implement specific cost-savings measures that UMB believes should have been implemented. *Id*. at ¶ 48.

UMB also alleges that Asbury "indicated interest in purchasing Inverness at a distressed price" as early as March 2018 by offering to purchase Inverness in an effort to become the stalking horse bidder. SAC at ¶¶ 170-171. However, Inverness received higher offers and ultimately chose a different bidder. *Id.* ¶ 175.

## II. MOTION TO DISMISS STANDARD

A Complaint must contain "a short and plain statement of the claim, showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Complaint must contain enough "factual matters, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citations omitted). The trial court must insist the plaintiff put forward specific, non-conclusory factual allegations, to assist the court in determining whether the complaint is plausible. *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). The mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe [the] plaintiff has a reasonable likelihood of mustering factual support for [the] claims." *Id.* at 1247.

"The nature and specificity of the allegations required to state a plausible claim will vary based on the context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). A plaintiff is not entitled to file a bare bones complaint and fill in the necessary facts after discovery is complete. *London v. Beaty*, 612 Fed. Appx. 910, 916 (10th Cir. 2015). The trial court must insist that the plaintiff put forward specific, non-conclusory factual allegations, to assist the court in determining whether the complaint is plausible. *Robbins*, 519 F.3d at 1249.

### III. ANALYSIS

#### I. Tortious Interference with Contract

UMB alleges Asbury interfered with UMB's contractual right to receive the full amount of the Bond Debt from Inverness by "refusing to support Inverness, manufacturing a liquidity crisis at Inverness, refusing to implement cost saving measures which would have significantly increased the value of Inverness, and replacing the Inverness Board…." SAC ¶ 224.

To prevail on its claim, UMB must establish:

1) Asbury's alleged interference was with an existing contractual or business right;

2) Asbury's alleged interference was malicious and wrongful;

3) the interference was neither justified, privileged nor excusable; and

4) the interference proximately caused UMB damage.

*Wilspec Technologies, Inc.*, 204 P.3d 69, 74 (Okla. 2009). Such a claim is viable only if the alleged interferer is not a party to the contract or business relationship. *Id.*

##### A. Statute of Limitations

The statute of limitations for a tortious interference with contract claim is two (2) years. 12 Okla. Stat. § 95; *see also Metro Oil Co., Inc. v. Sun Refining & Marketing Co.*, 936 F.2d 501, 504 (10th Cir. 1991). UMB has alleged that its tortious interference with contract claim occurred in

January 2018. SAC ¶¶ 21, 77, 80. UMB did not commence this litigation until March 17, 2020. Therefore, UMB's claim for tortious interference with contract is barred by the applicable statute of limitations.

Under Oklahoma law, a cause of action accrues upon the date the tortious act, or the happening of the breach, and not the date of the resulting damage." *Id*. at 504. In its Response, UMB contends that its claim is based upon "Asbury's intentional interference with UMB's rights under the Existing Contracts after the Initial Default . . . ." (Doc. 56 at p.22). However, one of UMB's key allegations is that Inverness stopped making its debt service payments on the Bond Debt in January 2018 because Asbury announced it would no longer monetarily support Inverness. *See* SAC ¶¶ 21, 77, 80. Accordingly, any claim UMB may have had for tortious interference with contract accrued in January 2018, regardless of whether UMB experienced additional damages as a result of Inverness' failure to make subsequent payments.

UMB further argues that it can bypass the limitations period because Inverness made multiple breaches by failing to make subsequent monthly payments. However, Oklahoma law provides that UMB's tort claim accrued from the date of Inverness' initial default in January 2018. *City of Tulsa v. Bank of Oklahoma, N.A.*, 280 P.3d 314, 320 (Okla. 2011)(holding that tort claim based on default by third party on loans accrued from date of first default).

Further, UMB's argument that it did not have knowledge of Asbury's alleged tortious interference until July 2018 is also contradicted by its own allegations in its SAC. UMB alleges that it knew that Inverness failed to make its debt payments beginning in January 2018 because Asbury announced it would no longer monetarily support Inverness. *See* SAC ¶¶ 21, 77, 80. Because UMB alleges the contract at issue was breached in January 2018, and it knew of the breach

5

and the alleged cause of the breach at that time, UMB's tortious interference with contract claim accrued in January 2018.

Finally, UMB argues that the tortious breach of contract claim is not barred by the two year statute of limitations because the interference with the existing contracts "and the Restructuring Opportunities" occurred in July 2018. However, a restructuring opportunity is not a contract and there can be no tortious breach of contract when the relationship with which the defendant purportedly interfered is not a contract. *Wilspec Technologies, Inc. v. Dunan Holding Group*, 204 P.3d 69, 71-72 (Okla. 2009); *See also Silver Point Fin., LLC v. Deutsche Bank Trust Co. Ams. (In re K-V Discovery Solutions, Inc.)*, 496 B.R. 330, 342 (Bankr. S.D.N.Y. 2013) (Whereas a refinancing may start a new contract between the parties, a restructuring refers to altering an already existing contract between the parties.). Therefore, the Court finds the "Bond Restructuring Opportunity" was a reorganization of, or an amendment to, UMB's existing contractual relationship with Inverness. Accordingly, the claim for tortious interference is time-barred.

### B. Representative Capacity

UMB's tortious interference with contract claim also fails because one who acts in a representative capacity cannot be liable for tortious interference with the contract of its principal. *Ray v. American Nat'l Bank & Trust Co. of Sapulpa,* 894 P.2d 1056, 1060 (Okla. 1994); *Wilspec Technologies, Inc. v. Dunan Holding Group, Co., Ltd*., 204 P.3d 69, 74 (Okla. 2009). Asbury acted in a representative capacity on behalf of Inverness in nearly every respect. *See* SAC ¶ I. As such, Asbury cannot be held liable for tortiously interfering with contracts in which it acted in a representative capacity.

The Oklahoma Supreme Court has further determined that a tortious interference with contract claim can only be maintained against a stranger to the contract. *See Ray v. American Nat'l Bank & Trust Co. of Sapulpa,* 894 P.2d at 1060; *See also*, *Wilspec Technologies, Inc. v. Dunan Holding Group, Co., Ltd.*, 204 P.3d at 74 ("The claim is viable only if the interferor is not a party to the contract or business relationship."). Asbury, as sole member and supporting organization of Inverness, was not a true stranger to the contract between UMB and Inverness.

## II. Tortious Interference with Prospective Economic Advantage

UMB alleges Asbury tortiously interfered with its prospective economic advantage by replacing the Inverness Board of Directors to prevent approval of the restructuring of the Bond Debt. In the SAC, UMB also alleges that Asbury interfered with the restructuring opportunity by continuing to take management fees which are the subject of UMB's breach of contract claims, and failing to provide the financial assistance UMB wanted Asbury to provide. SAC ¶ 223. The elements of a claim for interference with a prospective economic advantage are:

1) the existence of a valid business relation or expectancy;

2) knowledge of the relationship or expectance on the part of the interferer;

3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

4) resultant damage to the party whose relationship has been disrupted.

*Loven v. Church Mutual Insurance Co.,* 452 P.3d 418, 425 (Okla. 2019). UMB's allegations do not establish such a claim.

### A. UMB and Inverness had an Existing Contract

A claim for interference with prospective economic advantage is improper where the parties' relationship has been reduced to a contract. The Restatement (Second) of Torts provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

*Wilspec Technologies, Inc. v. Dunan Holding Group, Co., Ltd.*, 204 P.3d 69, 72 fn. 3 (Okla. 2009)(*quoting* Restatement (Second) of Torts § 766B). As the Restatement suggests, the prospect of a contract or business relationship is necessary. Courts interpreting Section 766B note "this Section is concerned only with intentional interference with prospective contractual relations, not yet reduced to contract." *Pizza Mgmt., Inc. v. Pizza Hut, Inc.,* 1989 WL 46253, *15 (D. Kan. April 14, 1989) (rev'd on other grounds, 1989 WL 89937 (D. Kan. July 19, 1989); *see also Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1161 (D. Kan. 1990); *see also* Okla. Uniform Jury Instruction No. 24.2, Notes on Use. A claim for interference with prospective economic advantage is unavailable where the parties' relationship "is based on subsisting, not potential, contracts." *Pizza Mgmt., Inc.*, 1989 WL 46253, *15.

In its SAC, UMB pleads that it had an existing contract with Inverness for the Bond Debt and that it was harmed because the Bond Debt was not paid in full (SAC ¶¶ 21, 77, 80, 234). Accordingly, UMB does not dispute that any expectation of full payment of the debt was based on the existing contract it had with Inverness.

### B. Enforcement of Contractual Rights

The exercise of a contractual right does not amount to tortious interference with prospective economic advantage. *Medical Diagnostic Laboratories, LLC v. Health Care Service Corporation*, 772 Fed. Appx. 637, 641 (10th Cir. 2019) (unpublished) ("asserting contractual rights . . . does not amount to tortious interference."). Accordingly, any claim for interference based on the

replacement of the Inverness Board [the Bylaws expressly allow Asbury to remove and replace Inverness Board members], the decision to stop supporting Inverness monetarily [the Management Services Agreement ("MSA") expressly provides that Asbury is not responsible for paying Inverness' expense when Inverness lacks sufficient funds ¶ II(B)(9)], or any other contractual right of Asbury [the MSA expressly provides that Asbury was to provide financial forecasting services only as requested by Inverness and "deemed necessary and appropriate" by Asbury (¶ II(B)(10)], is not a viable tort claim.

### C. Causation

UMB's allegations in the SAC demonstrate Asbury's alleged post March 2018 conduct did not cause UMB's injuries or Inverness' breach. Oklahoma jurisprudence makes clear that in order to recover for tortious interference with contract, the plaintiff must establish the alleged interference produced the breach of the contract. *See Wilspec Technologies, Inc.*, 204 P.3d at 72 ("Section 766 focuses on conduct directed at a third party which induces the third party to breach his contract with the plaintiff."); *see also Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427, 428 (Okla. 1979)(plaintiff must establish "damage was proximately sustained as a result of the complained-of interference.").

The injury UMB complains of is that it did not receive the full amount of the Bond Debt. SAC ¶ 232. UMB's SAC demonstrates Inverness' conduct, not Asbury's, caused UMB's damages. *Id.* at ¶ 21 ("In January 2018, Inverness stopped making payment on the Bond Debt and defaulted on the Bonds …."). Inverness was obligated to repay the Bond Debt. *Id.* at ¶¶ 13–14 ("Inverness agreed to pay principal and interest payments as and when such amounts were due…."). Asbury had no duty to repay the Bond Debt or fund Inverness' repayment of the same. *See Id.* at ¶¶ 13–14

9

(Asbury was not obligated to make payments); ¶ 80 (Inverness stopped making payments on the bonds because Asbury announced that it would no longer provide additional loans.).

Further, Inverness' default, and UMB's alleged injury, occurred prior to the change of Board members or the liquidity crisis that UMB alleges was an unlawful interference. UMB's SAC establishes the following timeline:

- Inverness defaulted on the Bond Debt in January of 2018. *Id.* at ¶¶ 21, 80.
- The "cost saving measures" were presented to Inverness' Board and Asbury representatives on February 22, 2018. *Id*. at ¶¶ 101 - 102.
- On February 22, 2018, UMB met with Asbury to review and discuss Asbury's projections of Inverness' financials. *Id*. at ¶ 101.
- Asbury informed relevant parties of the liquidity crisis in July of 2018. *Id.* at ¶ 172.
- Inverness' Board was replaced in August of 2018. *Id.* at ¶¶ 142, 145.

UMB cannot establish that these acts induced Inverness to breach its obligations under the Bond Debt when they all occurred after Inverness' default. *See Berman v. Davidson Media Virginia Stations, LLC*, 2016 WL 775784, *3 (E.D. Va. Feb. 26, 2016) ("[i]t stands contrary to basic logic that an event that occurred after the breach of a contract could have caused the same breach.") (dismissing tortious interference with contract claim for failure to state a claim); *see also Knight Enterprises, Inc. v. RPF Oil Company*, 829 N.W.2d 345, 349 (Mich. App. 2013) (tortious interference with contract claim failed where defendant's alleged misconduct occurred after third party's breach). As discussed *supra,* Oklahoma law provides that the tort claim alleged against Asbury accrued from the date of Inverness' initial default in January 2018.

### D. Interference is Privileged if Undertaken in Good Faith

UMB must also establish Asbury acted without justification, privilege, or excuse. *Wilspec Technologies, Inc.,* 204 P.3d at 74. "Oklahoma law holds that an actor's course of conduct is privileged if its primary focus was protection of the actor's legitimate economic interests rather

than interference." *Med. Diagnostic Labs., LLC,* 772 Fed. Appx. 637 at 641 (internal citations and quotations omitted). Interference is privileged when it is "undertaken in good faith and for a bona fide organizational purpose." *Hawk Enterprises, Inc. v. Cash America Intern., Inc*., 282 P.3d 786, 793 (Okla. 2012) "[A]lthough this privilege is not absolute and can be lost when the underlying motive is to harm another, asserting contractual rights does not amount to tortious interference." *Med. Diagnostic Labs, LLC,* 772 Fed. Appx. at 641.

UMB alleges Asbury's failure to act constitutes tortious interference. For example, UMB alleges Asbury failed to support Inverness and failed to implement cost saving measures. However, as stated *supra,* Asbury had no obligation to support Inverness financially or implement specific cost savings measures. *See* MSA ¶ II(B)(3), (5), (9), and (10). The MSA also states:

> [Inverness] shall at all times exercise control over the assets and operation of the Facility ….
>
> [Asbury] shall take no action, expend no funds, and incur no obligation with respect to Major Decisions affecting the Facility, unless such Major Decisions have been approved by the Board of Directors of [Inverness].

SAC at Exhibit 1, §§ I(C) and I(E). The MSA, by its own terms, provides that Asbury was not required to support Inverness or pay its debts. *Id.* at ¶ II(B)(9). Further, Asbury could not take such actions because those responsibilities fell to Inverness. Therefore, Asbury was under no duty to act and such inaction was justified.

Next, UMB contends Asbury is responsible for the replacement of Inverness' Board of Directors and this replacement resulted in UMB not receiving the full amount of the Bond Debt. The SAC, however, establishes that pursuant to Inverness' Bylaws, Asbury had the right to replace Inverness' Board of Directors. *Id*. at ¶ 60(d). Asserting a contractual right does not amount to tortious interference. *Med. Diagnostic Labs, LLC,* 772 Fed. Appx. at 641. Removing an individual

from his position when such removal is within the scope of the parties' agreement does not amount to a tortious interference with contract claim. *See, Ransome v. O'Bier*, 2017 WL 1437100, *3 (E.D. Va. April 20, 2017) (dismissing tortious interference with contract claim because reassignment of principal to an administrative role was within the scope of employment agreement). Accordingly, UMB's claim for tortious interference with contract claim is dismissed.

## IV. CONCLUSION

The Court finds UMB's claims for tortious interference with prospective economic advantage and tortious interference with contract fail as a matter of law. The tortious interference with contract claim is time-barred, and a tortious interference with contract claim can only be maintained against a stranger to the contract. The tortious interference with prospective economic advantage claim fails because Inverness' relationship with UMB was reduced to a contract and Asbury's conduct was authorized. Moreover, Asbury's alleged conduct did not cause Inverness to breach its contract with UMB, and Asbury's alleged conduct was justified. Accordingly, Defendant's Partial Motion to Dismiss is granted.

**IT IS SO ORDERED** this 8th day of October, 2021.

**TERENCE KERN**
**United States District Judge**